**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
Danville Division

PHYLLIS A. ADKINS**,**          )
         Plaintiff,        )
                      )
v.                       )     Civil Action No. 4:13-cv-00024
                      )
CAROLYN W. COLVIN**,**       )
Acting Commissioner,      )
Social Security Administration,   )     By:    Joel C. Hoppe
         Defendant.     )     United States Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Phyllis Adkins asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. Adkins argues that the Administrative Law Judge ("ALJ") erred in not addressing the opinion of a physical therapist and in assessing Adkins's credibility. This Court has authority to decide Adkins's case under 42 U.S.C. § 405(g), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

After carefully reviewing the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the ALJ applied the correct legal standards and that substantial evidence in the record supports his decision that Adkins was not disabled between May 30, 2010, and January 27, 2012. (R. 20.) Therefore, I **RECOMMEND** that this Court **DENY** Adkins's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 18), and **DISMISS** this case from the Court's active docket.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if " 'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.' " *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Adkins filed for DIB on August 31, 2010, alleging disability beginning May 30, 2010. (R. 49.) She was 49 years old, had a 12th grade education, and had worked for many years as a factory laborer. (*See* R. 26, 42, 50.) Adkins said that she could not work anymore because of shingles, knots in her hands, fibromyalgia, left-side pain, and anxiety. (R. 50.) However, she later clarified that she was laid off in May 2010, and that her conditions did not force her to stop working. (*See* R. 39, 264.) A state agency denied Adkins's application in October 2010 and March 2011 because medical records available at the time did not establish that she had a "severe" medically determinable impairment. (R. 18, 52–54, 58–60.)

Adkins appeared with counsel at an administrative hearing on January 5, 2012.[1] (R. 21.) She testified as to her conditions and the limits they caused in her daily activities. (*See generally* R. 26–39.) A Vocational Expert ("VE") also testified as to the type of jobs Adkins could perform given her age, education, work history, and physical limitations. (*See generally* R. 40–48.) In a

---

[1] The transcript is incorrectly dated January 5, 2013. (*See* R. 21.) The hearing was held on January 5, 2012. (*See* R. 13, 90, 105, 108, 118.)

written decision dated January 27, 2012, the ALJ found that Adkins was not disabled after May 30, 2010. (R. 20.) He denied her application at Step Five. (*Id.*)

At Step One, the ALJ found that Adkins had not worked since her alleged onset date. (R. 15.) At Step Two, he found that Adkins suffered from severe "neck and back difficulty," fibromyalgia, and "non-dominant left shoulder impingement." (R. 15.) He also found that Adkins's other alleged impairments were "non-severe" because they responded to medication, did not last for 12 continuous months, or did not require significant medical treatment. (*Id.*) At Step Three, the ALJ concluded that Adkins did not have a severe impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18.)

The ALJ determined that Adkins had the residual functional capacity ("RFC")[2] to do light work, except that she: (1) "cannot engage in left (non-dominant) arm overhead reaching"; (2) cannot climb ladders, ropes, or scaffolds; and (3) must avoid concentrated exposure to hazards. (R. 16.) In making that determination, the ALJ considered the extent to which Adkins's impairments and symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence" in her record. (*Id.*) He also considered Adkins's testimony, her self-reported daily activities, and opinions from examining and state-agency sources. (R. 16–19.) The ALJ found that Adkins's impairments could reasonably cause her symptoms, but that her description of their intensity, persistence, and limiting effects was "not . . . entirely reliable." (R. 18.) He noted in particular that the record revealed "some inconsistencies in [Adkins's] allegations." (R. 17–18.)

---

[2] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 404.1545(a), and reflects the "total limiting effects" of the person's impairments, *id.* § 404.1545(e).

At Step Four, the ALJ concluded that Adkins could not return to her past factory jobs because they were too physically demanding. (R. 19.) Relying on the testimony of a VE at Step Five, the ALJ concluded that Adkins could still perform some unskilled light-duty occupations such as cashier, rental-counter clerk, and inspector grader. (R. 20.) The ALJ also concluded that all three jobs existed in significant numbers in the national economy. (R. 20.) Thus, he found Adkins was not disabled after May 30, 2010. (*Id.*) The Appeals Council declined to review the ALJ's decision on April 11, 2013 (R. 1), and this appeal followed.

### III. Statement of Facts

The administrative record contains medical evidence from February 2010 through January 2012. (*See generally* R. 194–97, 205–223, 225, 228–230, 249–255, 258–268.) On February 11, 2010, Adkins presented to Dr. Robert I. Elliott's office with signs of herpes zoster, or shingles. (R. 195.) Dr. Elliott prescribed Lyrica and instructed Adkins to follow up as needed. (*Id.*) Adkins also reported recurring back pain and received a refill for Flexeril, a prescription-strength muscle relaxant.[3] (*Id.*) Otherwise, she reported that she was in "good" health. (*Id.*)

Adkins returned to Dr. Elliott's office on September 21, 2010. (R. 194.) She reported lower back pain with "some stiffness and pain down into the left leg." (*Id.*) On exam, Dr. Elliott observed spasms and decreased range of motion in Adkins's lower back. (*Id.*) Noting that Flexeril apparently did not help, Dr. Elliott prescribed a different muscle relaxant, ibuprofen, moist heat, and range-of-motion exercises. (*Id.*) He instructed Adkins to call his office in two weeks. They would consider spine x-rays if she had not improved by that time. (*Id.*)

Adkins next visited Dr. Elliott's office four months later on January 4, 2011, complaining of "various arthralgia and myalgia" (*i.e.*, joint and muscle pain) for the past 25 years. (R. 214.)

---

[3] Flexeril (Cyclobenzaprine Hcl) is a muscle relaxant that is usually taken one to four times each day for up to three weeks. *Cyclobenzaprine*, Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited June 20, 2014).

She reported pain in her left shoulder, left hip, neck, and lower back. (*Id.*) Adkins also said without elaborating that she "felt unsteady on her feet" and had recently fallen. (*Id.*) On exam, Dr. Elliott observed that Adkins had difficulty rotating, flexing, and extending her neck bilaterally. (*See id.*) Her left shoulder had "good range of motion including internal and external rotation," but there was "quite a bit of crepitus in [that] shoulder joint when she [did] any range of motion." (*Id.*) Her left hip and spine were also tender to palpation.

Dr. Elliott ordered x-rays of Adkins's left shoulder, left hip, lumbar spine, and cervical spine. (*Id.*) Films taken the next day showed no abnormalities in the shoulder and hip, but "some minor facet arthropathy" in the lumbar and cervical spine. (R. 212–13.) "Degenerative changes [were] seen primarily at C5-C6 with intervertebral disc narrowing and marginal spurring" bilaterally. (R. 213.) Adkins also had an MRI of her cervical spine on January 18, 2011. (R. 210.) "Small," "slight," and "minimal" to "moderate" degenerative changes were again noted at C5-C6. (R. 210.)

Adkins twice saw a chiropractor, Adam Palmer, in January 2011. (*See* R. 250, 255.) On January 19, 2011, she reported "very mild" neck pain that "slightly" interfered with her ability to sleep, read, drive, and engage in all of her usual (unidentified) recreational activities. (R. 251.) But Adkins also said that it was "painful to look after [her]self" and that she could not "lift or carry anything at all." (*Id.*) Adkins reported experiencing "constant" neck, back, and hip pain every day for the past 20 years. (*See id.*) Standing, walking, bending, and lying down were painful, but sitting apparently was not. (*See id.*)

Adkins canceled her third appointment with Palmer and never returned. (*See* R. 249.) Palmer later wrote that he "was unable to find any objective findings to correlate with [Adkins's]

subjective complaints." (*Id.*) He also declined Adkins's request to fill out a DMV application for a handicap sticker for her car. (*See id.*)

Adkins returned to Dr. Elliott's office on January 21, 2011. (R. 209.) She again reported pain in her neck and shoulders. On exam, Dr. Elliott observed full range of motion in the neck and left shoulder, intact grip strength, good forward flexion, and good opposition movements to downward pressure on both extended arms. (*Id.*) Dr. Elliott also noted his "concern for fibromyalgia" given the "trigger point tenderness" throughout Adkins's body. (*Id.*) He ordered several tests and referrals to first rule out other disorders. (*See id.*)

Adkins returned to Dr. Elliott's office on February 15, 2011. He found that she "seem[ed] to be responding quite well to treatment." (R. 206.) Dr. Elliott noted that Adkins saw a Dr. Wallace in the interim, but that he did not have those treatment records.[4] (*See* R. 207.) He also noted that Adkins "checked out fine" according to Dr. Wallace's neurologic tests and "showed no evidence of rheumatoid disease." (*Id.*) On exam, Dr. Elliott observed no crepitus and "good range of motion" in the left shoulder. (*Id.*) Adkins had "pain from forward flexion between 40 degrees and greater than 90 degrees." (*Id.*) Dr. Elliott thought that there "could be some problem with her left shoulder" and instructed Adkins to see an orthopedist for a "worrisome" rotator cuff. (*Id.*) Otherwise, they would take a wait-and-see approach. (*See* R. 206–07.) Dr. Elliott also increased Adkins's Lyrica because her aches and pains, except for those in her lower back, were "much better" on the lower dose. (R. 206.)

Adkins went to an orthopedist, Dr. Peter Caprise, M.D., on February 21, 2011. (R. 222.) Dr. Caprise diagnosed "impingement syndrome" in Adkins's left shoulder. (*Id.*) He injected that shoulder joint and referred Adkins to physical therapy. (R. 222–23.) Adkins later told another

---

[4] These treatment records are also missing from the administrative record.

doctor that she "did not do the therapy that Dr. Caprise recommended" because she was "still doing" home exercises prescribed by a physical therapist 20 years earlier. (R. 216.)

Adkins returned to Dr. Elliott's office on March 9, 2011. (R. 205.) She reported that her left shoulder felt "a bit better" after Dr. Caprise's injection, but that she had felt nauseous, dizzy, and lightheaded since then. (*See id.*) She did not report any musculoskeletal pain or stiffness at this visit. Dr. Elliott gave Adkins a trial of anti-nausea medication and instructed her to follow up as needed. (*Id.*)

Adkins went to another orthopedist, Dr. Sara McCowen, M.D., on March 17, 2011. (R. 216.) She reported a "20-year history of fibromyalgia," left-side neck pain, and "circumferential left upper-extremity pain into all 5 fingers of her hand." (*Id.*) Adkins said that she used to experience numbness, but now there "is just pain and lack of feeling" in her hand. (*Id.*) Adkins also said that she experienced "constant" and "unbearable" "sharp, stabbing, throbbing, aching, shooting, tingling, burning, pulling, and tearing" pain that is aggravated by lifting. (*Id.*) Heat, ice, Lyrica, and Cymbalta helped at that time. (*Id.*) On this day, her pain was "7 to 10 out of 10." (*Id.*)

On exam, Dr. McCowen observed some point tenderness on Adkins's shoulder, back, chest wall, and the left side of her neck. (*Id.*) Adkins had full range of motion in all joints and full strength in all extremities. (*See id.*) Dr. McCowen reviewed Adkins's x-rays and MRI from January 2011, and confirmed "mild-to-moderate" degenerative changes at C5-C6. (*See* R. 216–17.) She recommended that Adkins "consider several visits to physical therapy to augment her home exercise program." (R. 217.) Dr. McCowen instructed Adkins to follow up in four to six weeks after she started physical therapy. (*Id.*) There is no evidence in the record that Adkins initiated physical therapy or returned to Dr. McCowen's office. (*See, e.g.*, R. 264, 268.)

Adkins returned to Dr. Elliott's office on August 25, 2011. He noted that he had "not seen [her] in a while." (R. 228.) According to Dr. Elliott, Adkins reported "having a lot of trouble with what sounds like her fibromyalgia" and "chronic left shoulder dysfunction." (*Id.*) She again complained of "pain and discomfort in her neck that radiates into her left shoulder and arm and other joints." (*Id.*) She denied "any weakness *per se* in the arms and legs." (*Id.*) Adkins reported that she had not been taking Flexeril at all, but she apparently did not report any unacceptable side effects. (*See id.*) On exam, Dr. Elliott observed trigger points on the right upper shoulder and right lower back. (*Id.*) Dr. Elliott increased Adkins's anti-depressant medication, encouraged her to take the Flexeril, and instructed her to follow up in two weeks. (*See id.*)

Adkins returned to Dr. Elliott's office on December 1, 2011, reporting numbness, tingling, and burning on her face. (R. 259.) She reported feeling "dizzy" on an increased dose of Lyrica. (*Id.*) Adkins did not report any specific musculoskeletal pain at this visit. On exam, Dr. Elliott observed "normal tone with 5/5 strength," intact sensation, good strength bilaterally in the limbs, and tandem/nonataxic gait. (*Id.*)

Adkins followed up with Dr. Elliott on December 20, 2011. (R. 258.) She again reported that Lyrica "makes her feel worse, nausea, dizzy [*sic*]." (*Id.*) Adkins did not report any specific musculoskeletal pain, and she reported "no weakness, numbness, tingling in the arms, legs, etc." (*Id.*) Dr. Elliott added ibuprofen, but continued all other medications at their current doses. (*See id.*) Dr. Elliott also noted that Adkins "had a disability form to fill out based on her fibromyalgia, her cervical disc disease, and her [shingles]." (*Id.*) He said that he would "get physical therapy to evaluate" Adkins's functional capacity so he could "fill out the forms for the

attorneys a little bit more objectively." (*Id.*) The record does not contain a functional-capacity assessment from Dr. Elliott.

Brandy Wilson, a physical therapist at Rehab Associates of Central Virginia, conducted an initial evaluation of Adkins on January 4, 2012, to obtain a "functional capacity for her disability" application. (R. 264, 267.) Wilson observed that Adkins walked with "forward head and shoulder posture" and was "hesitant with walking with mild antalgic gait on the left at times." (R. 265.) Adkins scored "4+/5" to "5/5" on all right-side muscle-strength tests and "3+/5" to "4/5" on all left-side muscle-strength tests. (R. 265–66.) Adkins walked at 1.1 mile per hour and clocked 11.61 seconds on her "timed up and goes." (R. 267.) Wilson noted deceased range of motion in the lumbar spine, "generalized muscle weakness" in all extremities, and "increased pain." (*Id.*) She opined, "I feel due to the chronicity of [Adkins's] symptoms and the fact that they are working [*sic*] she will be limited in her functioning." (*Id.*) Wilson noted that Adkins was a "moderate fall risk" and that pain and stiffness "prevented full functional activity." (R. 267.) She also listed, but did not explain, several "problems" related to Adkins's pain and stiffness: "Pain limits functional activities. Decreased ROM preventing full functional activity. Decreased strength limiting functional activities. Decreased participation in recreational activities. Decreased postural strength and awareness [*sic*]." (*Id.*)

## IV. Discussion

Adkins makes two arguments on appeal. First, she argues that the ALJ erred when he did not expressly weigh the physical therapist's opinion regarding her functional limitations. (Pl. Br. 12–13.) Second, she argues that the ALJ improperly evaluated her complaints of pain and that his credibility finding is not supported by substantial evidence. (*Id.* 14–16.) On the latter point,

Adkins also argues that the medical evidence in the record "clearly corroborates" her subjective complaints and proves that she is disabled from all work. (*See id.* 15–16.)

A.        *Non-Acceptable Medical Source Opinions*

Adkins argues that the ALJ misapplied 20 C.F.R. § 404.1513(d) and Social Security Ruling 06-3p when he did not expressly consider physical therapist Brandy Wilson's opinions. (Pl. Br. 12–13.) As Adkins recognizes, physical therapists are "non-acceptable medical sources" that cannot give "medical opinions" about the applicant's condition. (Pl. Br. 12.) *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2; *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (noting that a physical therapist is not an "acceptable medical source"). But they can provide valuable information, including opinions, about "the severity of the individual's impairment[] and how it affects the individual's ability to function." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2 (citing 20 C.F.R. § 404.1513(d)).

The ALJ should consider these opinions as he would any relevant evidence, "especially when . . . the non-acceptable medical source had a lengthy relationship with the claimant and can present relevant evidence as to the claimant's impairment or ability to work." *Hall v. Colvin*, No. 7:12-cv-327, 2014 WL 988750, at *8 (W.D. Va. Mar. 13, 2014) (citing *Foster v. Astrue*, 826 F. Supp. 2d 884, 886 (E.D.N.C. 2011)). But these opinions are not entitled to any particular weight. Soc. Sec. R. 06-03p, 2006 WL 2329939, at *4–5. In fact, the ALJ is not required to explain the weight given to such opinions unless it might affect the case's outcome. *Id.* at *6; *see also Craig*, 76 F.3d at 590 (finding no error in ALJ's failure to expressly weigh physical therapist's opinion).

In reviewing Adkins's record, the ALJ noted that a "January 2012 initial evaluation at Rehab Associates of Central Virginia [by Wilson] endorsed that [Adkins] had decreased range of motion preventing full functional activity and decreased strength limiting functional activities."

(R. 18.) He did not specifically mention physical therapist Wilson's opinion that Adkins had functional limitations. Adkins contends that Wilson's opinion provided evidence that Adkins had functional limitations that precluded her from performing substantial gainful activity and that the ALJ erred in not explaining the weight he assigned this opinion.

I must disagree with Adkins's description of Wilson's opinion. Beyond noting Adkins's "moderate fall risk," Wilson did not identify any specific limitations on Adkins's ability to perform work-related tasks. (R. 267.) She simply noted that Adkins's pain and stiffness "prevent[ed] full functional activity." (*Id.*) Wilson did not indicate any restrictions on sitting, standing, walking, stooping, bending, crawling, kneeling, lifting, or any other functional limitation other than that she was a moderate fall risk. Her opinion was vague and did not specifically state what Adkins could or could not do. Additionally, Wilson based her findings on a single evaluation of Adkins.

In assessing Adkins's RFC, the ALJ discussed the medical evidence in the record. (R. 16-18.) In particular, the ALJ noted the results of x-rays and MRIs taken of Adkins's neck and back, Dr. Elliott's and Dr. McCowen's findings of intact strength in Adkins's extremities, Dr. Elliott's findings that she had full range of motion in her neck and full rotation of her left arm, and Wilson's findings of decreased range of motion in the cervical and lumbar spine. (R. 17-18.) He also noted the treatment for her conditions.

Based on his review of the medical and other evidence, the ALJ limited Adkins to light-duty jobs where she would never reach overhead with her left arm; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. (R. 18.) I find that this RFC was amply supported by substantial evidence in the record.

Moreover, Wilson's opinion does not necessarily contradict the ALJ's assessment of Adkins's RFC. Wilson is a non-acceptable medical source who provided a vague opinion of Adkins's limitations after a single evaluation, and her opinion does not state specific functional limitations greater than those the ALJ provided in Adkins's RFC. Accordingly, I cannot find that that ALJ erred in not explaining the weight he gave to Wilson's opinion. *See Hall*, 2014 WL 988750, at \*8 ("procedural perfection in administrative proceedings is not required") (citations and quotations omitted).

B.    *Adkins's Credibility*

Adkins next argues that the ALJ improperly evaluated her complaints of pain and that his reasons for finding her testimony "less than fully credible are not supported by substantial evidence." (Pl. Br. 14.) She also argues that the medical evidence in her record "clearly corroborates" her complaints and proves that she is disabled from all work. (*See id.* 15–16.)

1.    *Adkins's Testimony*

In January 2012, Adkins testified that she experienced pain in her neck, left arm, lower back, and left lower extremity. (R. 27.) She attributed her neck and arm pain to an on-the-job injury at least a decade earlier. (*See* R. 40–41.) That pain is constant, but her back hurts "mostly just when [she] walk[s] and sometimes when [she] sit[s] for a long time." (*Id.*) Walking, sitting, and lying down also exacerbate the pain in her hip. (R. 29–30, 31, 33.) Adkins said that she could walk for five minutes, stand for 10 minutes, and sit for 15 minutes at one time. (R. 30–31.) She also said that she could not bend or squat because she will lose her balance and fall. (R. 31.)

Adkins testified that she had trouble doing "anything" with her left hand because it had "no more" strength or feeling. (R. 32; *see also* R. 36–37.) "[I]f it gets too bad on [her] left side, [her] right will go to hurting a little bit and then [her] hands go numb," she said. (*Id.*) Adkins also

testified that she could not reach in any direction with her left arm because it lacks sensation and "hurts all the time." (R. 36–37; *see also* R. 32.) That impairment did not significantly interfere with her self-care, but it essentially precluded her from doing household chores. (*See* R. 33–34, 36.) For example, Adkins said that washing dishes for "maybe six or seven minutes" causes so much pain in her arm that she "can't hardly do nothing [for] the rest of the day." (R. 36.)

Adkins testified that she took Flexeril and Lyrica for pain. (R. 28–29.) She said that they either did not work or seriously interfered with her functional abilities. (*See* R. 28–29, 37–39.) For example, she testified that Flexeril "helps" for part of the day but also "knocks [her] out" and "makes [her] really tired." (R. 29, 39.) Lyrica "now" does not work at all and makes her "dizzy headed" two or three times per day. (R. 28, 37–38.) Adkins told the ALJ that she continues to self-treat with heat and mineral ice, which "really helps" the pain. (R. 30.)

2.      *The ALJ's Credibility Determination*

The ALJ first summarized Adkins's testimony describing her impairments, symptoms, current daily activities, and perceived functional limitations. (*See* R. 16–17.) He then reviewed Adkins's medical records documenting her neck and back difficulty, fibromyalgia, and left-shoulder impingement. (*See* R. 17–18.) After reviewing those records, the ALJ determined that Adkins's impairments could reasonably cause her symptoms, but that the objective medical evidence did not fully substantiate her testimony. (*See* R. 17–18.) He found that Adkins's description of her symptoms' intensity, persistence, and limiting effects "may not be entirely reliable" because the record revealed "some inconsistencies in [her] allegations." (R. 18.)

For example, Adkins reported in September 2010 that she did "all the housework" every day, cooked full meals twice per day, independently cared for her young granddaughter, fed the family's dogs and goats, and drove herself to the grocery store "about twice a week." (R. 146–

49; *see also* R. 18.) But in January 2012, Adkins testified that she rests most of the day, cannot

do any housework, can sit for only 15 minutes at a time, and must rest after 10 minutes of doing

"anything at home." (R. 30, 31, 33, 34.) She also said that she could not do "anything" with her

left hand because it had "no more" strength or feeling. (R. 32; *see also* R. 36–37.) Similarly, the

ALJ noted that Adkins made conflicting statements about her medications. In March 2011, for

example, Adkins told Dr. McCowen that Lyrica helped her fibromyalgia pain. (*See* R. 216; *see*

*also* R. 18.) But in January 2012, Adkins testified that the Lyrica now was "not helping" at all.

(R. 28; *see also* R. 18.)

    *3.*     *Analysis*

    ALJs follow a two-step process for evaluating an applicant's statements about her

symptoms. *See* 20 C.F.R § 404.1529; Soc. Sec. R. 96-7p, 1996 WL 374186 (Jul. 2, 1996). First,

the ALJ must "consider whether there is an underlying medically determinable physical or

mental impairment . . . that could reasonably be expected to produce" the applicant's alleged

symptoms. Soc. Sec. R. 96-7p, 1996 WL 374186, at *2. If there is, the ALJ "must evaluate the

intensity, persistence, and limiting effects of the individual's symptoms to determine the extent

to which [they] limit [her] ability to do basic work activities." *Id.* Second, whenever the

applicant's symptoms are "not substantiated by objective medical evidence," the ALJ "must

make a finding on the credibility of the individual's statements" in light of the entire record. *Id.*

He must give specific reasons for the weight given to the applicant's statements, *id.*, and those

reasons must be supported by substantial evidence in the record, *see Craig*, 76 F.3d at 589.

    It is not this Court's role to determine whether Adkins was a credible witness. *See Craig*,

76 F.3d at 589; *Shively*, 739 F.3d at 989. Rather, the court must be satisfied that the ALJ applied

the correct legal standard in evaluating Adkins's credibility, and that substantial evidence

supports his finding that her testimony was not "entirely reliable." (R. 18.) *See Craig*, 76 F.3d at 589. Both requirements were met here.

The ALJ reviewed Adkins's longitudinal medical records (R. 17–18); compared Adkins's testimony to her self-reported daily activities and statements to healthcare providers (R. 16–18); discussed the "relatively minor" findings on physical exams and diagnostic studies (R. 17–18); cited Adkins's conservative medical treatment (R. 18); weighed medical-source opinions that Adkins was not disabled (*id.*); and noted that "no treating or examining source . . . has imposed any limitations on her activities" (*id.*). The ALJ gave specific reasons for discrediting Adkins's complaints, and his analysis makes clear "the weight [he] gave to [Adkins's] statements and the reasons for that weight." Soc. Sec. R. 96-7p, 1996 WL 374186, at *2.

Substantial evidence supports the ALJ's finding that Adkins's testimony "may not be entirely reliable" because the record revealed "inconsistencies in [her] allegations." (R. 18.) The ALJ correctly identified significant inconsistencies between Adkins's testimony, self-reported daily activities, and statements to healthcare providers in the two-year longitudinal record. (*Id.* (citing R. 28, 30–34, 36–37, 146–49, 216).) Adkins argues that these inconsistencies show that her condition deteriorated between 2010 and 2012. (Pl. Br. 14–15.) The record does not support this argument.

For example, treating and examining sources consistently reported that Adkins had full strength and range of motion on exam in January, February, March, and December 2011. (*See* R. 214, 209, 249, 207, 216, 259.) That was true even when Adkins reported "constant" and "unbearable" pain in her neck and left shoulder. (R. 216.) Dr. Elliott noted "decreased" range of motion and point tenderness in September 2010 and January 2011. (*See* R. 194, 214.) He made these findings around the same time that Adkins reported doing "all the house work" every day,

cooking full meals twice per day, independently caring for her young granddaughter, looking after the family's dogs and goats, and driving herself to the grocery store "about twice a week" even though she experienced pain. (R. 146–49; *see also* R. 18.) Dr. Elliott did not note—and Adkins apparently did not report—any musculoskeletal pain, stiffness, or weakness during his December 2011 exam. (*See* R. 259.) The record simply does not contain evidence of a dramatic decline in Adkins's condition or functioning to defeat the deference this Court owes to the ALJ's credibility determinations. *See Dunn v. Colvin*, 973 F. Supp. 630, 648 (W.D. Va. 2013).

Adkins's complaints of disabling pain and perceived functional limitations also at times conflict with the medical evidence in her record. For example, Adkins's testimony that she has "no more" strength or feeling in her left upper extremity (R. 32, 36–37) conflicts with treatment notes documenting full strength and intact sensation bilaterally in January, March, and December 2011. (*See* R. 209, 216, 259.) That was true even when Adkins reported constant "pain and lack of feeling" in her left arm. (R. 216.) In March, August, and December 2011, Adkins also specifically denied experiencing weakness, numbness, or tingling in that arm. (*See* R. 216, 228, 258.) But, as the ALJ acknowledged, healthcare providers have occasionally observed tenderness, muscle weakness, and stiffness in Adkins's neck and left upper extremity. (*See* R. 17–18 (citing R. 214, 264–67; *see also* R. 206, 216.) The ALJ accommodated this impairment by limiting Adkins to a reduced range of light-duty work involving "no left (non-dominant) arm overhead reaching." (R. 19.)  The ALJ also accommodated Adkins's moderate fall risk, which was noted in the physical therapist's assessment as well as Adkins's claim that she can lose her balance, by limiting Adkins to light-duty work involving "no ladder, rope, or scaffold climbing and no concentrated exposure to hazards."[5] (R. 18.)

---

[5] The term "hazards" includes "unprotected elevations and dangerous moving machinery." Soc. Sec. R. 85-15, 1985 WL 56857, at *8 (Jan. 1, 1985).

The ALJ credited, to an extent, Adkins's complaints of pain. (*See* R. 18–19.) But he did not have to conclude that Adkins was pain-free in order find her "not disabled." Rather, Adkins's "pain must be so severe as to prevent [her] from performing *any* substantial gainful activity." *Damata v. Astrue*, No. 6:11-cv-19, 2012 WL 6964864, at *5 (W.D. Va. Dec. 27, 2012) (emphasis added). The ALJ's RFC determination fully accommodated the pain that Adkins said she suffered from her physical impairments. (*See* R. 16–19.) Indeed, it is the most restrictive functional-capacity assessment in this record. As the ALJ noted, no established healthcare provider "has imposed any limitations on [Adkins's] activities." (R. 18.)

Finally, Adkins argues that the medical evidence "clearly corroborates [her] allegations and a finding of total disability." (Pl. Br. 15.) She cites four medical records in support: January 2011 treatment notes in which Dr. Elliott observed "difficulty rotating [the] cervical spine greater than 45 degrees" bilaterally (R. 214); January 2011 x-rays showing "some minor facet arthropathy," "marginal spurring," and degenerative changes at C5-C6 (R. 213); a January 2011 MRI confirming "mild-to-moderate" degenerative changes at C5-C6 (R. 211; *see also* R. 216); and Wilson's January 2012 observation that Adkins had decreased range of motion in her neck and back (R. 267). Adkins also argues that Dr. Elliott "diagnosed [her] with fibromyalgia . . . which explains [the] pain in her neck, back, shoulders and arms that results in functional limitations disabling her from all employment." (Pl. Br. 15.)

The diagnostic tests showed mostly mild or minor abnormalities, with moderate degenerative changes only at C5-C6. Dr. Elliott, who ordered the diagnostic testing, provided the most consistent treatment for Adkins. Yet, such objective medical evidence did not spur Dr. Elliott to recommend any functional limitations, much less the complete disability Adkins proposes. Instead, he demurred when Adkins presented him disability paperwork. Additionally,

Dr. Elliott and other physicians, who also noted the diagnostic testing of Adkins's spine, treated her conservatively with ibuprofen, muscle relaxants, heat and ice, and several suggestions that Adkins try physical therapy. (*See, e.g.*, R. 194, 206–07, 216, 222–23, 228, 258, 268.) Adkins apparently never initiated physical therapy. (*See* R. 216, 264, 268.) Considering all of the evidence in the record, I the ALJ's determination that Adkins's allegations were not entirely credible is supported by substantial evidence.

The ALJ credited Adkins's complaints to the extent they were consistent with the medical evidence and evidence of her activities of daily living. He incorporated these credible complaints into her RFC and found that she could perform jobs that exist in sufficient numbers. Accordingly, I find that substantial evidence supports the ALJ's decision that Adkins was not disabled between May 30, 2010, and January 27, 2012.

## V. Conclusion

This Court must affirm the Commissioner's decision if it is supported by substantial evidence in the record and was reached through the correct application of the law. After carefully reviewing the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that both requirements were met in Adkins's case. Therefore, I **RECOMMEND** that this Court **DENY** Adkins's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER:     June 20, 2014

Joel C. Hoppe
United States Magistrate Judge